# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### NORTHEASTERN DIVISION

| | | |
|---|---|---|
| JIMMY SHANE CLICK, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | 5:01-cv-03217-JFG-JEO |
| | ) | |
| WARDEN RALPH HOOKS and | ) | |
| THE ATTORNEY GENERAL FOR | ) | |
| THE STATE OF ALABAMA, | ) | |
| | ) | |
| Respondents. | ) | |

## MEMORANDUM OPINION

This is an action for habeas corpus relief under 28 U.S.C. § 2254 by an Alabama state

prisoner under a sentence of life in prison without parole.  On December 14, 2001, with the

assistance of counsel, the petitioner filed his petition for writ of habeas corpus in this court,

challenging his state court conviction and sentence.  (Doc. 1 (hereinafter "Petition")).[1]  On

February 11, 2002, the petitioner submitted a pleading captioned "Supplemental Law."  (Doc. 4).

The respondents have filed an answer (doc. 9 (hereinafter "Answer")).  The petitioner has also

filed a reply to the Answer as well as additional exhibits, corrected fact citations, and a second

submission of "Supplemental Law."  (Doc. 11, 12, 13 & 14 (hereinafter "Response")).

## PROCEDURAL HISTORY

The petitioner was indicted on October 5, 1992, for the intentional murder of Ginger

Roberta McClure (hereinafter "McClure") during the course of first and second degree

burglaries.[2]  He was convicted following a jury trial on June 18, 1994, and was subsequently

---

[1] References to "Doc. __" are to the documents as numbered by the Clerk of the Court in this court's record of the case.

[2] ALA. CODE § 13A-5-40(a)(4).

sentenced to life in the state penitentiary without the possibility of parole.  (R. at 1244 and 1315).[3]

The petitioner filed a timely notice of appeal from the judgment of conviction and sentence, asserting twenty-four claims for reversal of his conviction.  (Respondents Ex. A).[4]  The Alabama Court of Criminal Appeals affirmed the petitioner's conviction on December 20, 1996.  *See Click v. State*, 695 So. 2d 209 (Ala. Crim. App. 1996).[5]  The petitioner then petitioned the Supreme Court of Alabama for a writ of certiorari which the court denied on May 9, 1997.  (Respondents Ex. B; Click Ex. C).[6]  Click petitioned the United States Supreme Court for a writ of certiorari which the Court denied on December 1, 1997.  (Respondents Ex. C; Click  Ex. D).

The petitioner then filed a Rule 32 petition with the Madison County Circuit Court challenging his conviction on October 30, 1998.  (Click Ex. Q).[7]  In his petition, he raised the following claims:

1.   Petitioner alleges that the trial court should have conducted a second hearing during the course of the trial in order to determine Petitioner's competence to stand trial.  (Allegation 1).

2.   Petitioner alleges that the State's Prosecutor improperly commented on Petitioner's Fifth Amendment right to remain silent by stating in opening statement ". . . the mastermind of that plot sits there with his head down.  I imagine he'll sit that way all week long."  (Allegation 2).

---

[3]References to "R. at ___" are to the trial transcript located at document 2.

[4]The respondents' exhibits are located at document 9.

[5]A copy of that opinion is located at document 2, exhibit B in the court's record of the case.

[6]The petitioner's exhibits are located at document 2.  They are referred to herein as "Click Ex. ___."

[7]Document 2, exhibit Q is the Madison County Circuit Court's record of Click's Rule 32 petition.  This court's recitation of the petitioner's claims is taken from the circuit court's order denying the petitioner's Rule 32 petition.  The order is located at pages 3-14.

3.     Petitioner alleges that he had a right to have his medication suspended during the course [of the trial] in order to give the jury an opportunity to see Petitioner's drug-free mental state. (Allegation 3).

4.     Petitioner alleges that the court should have given a jury instruction to the effect that Petitioner [sic] demeanor at trial was chemically induced and that it may not have been reflective of Petitioner's state of mind at the time of the offense. (Allegation 4).

5.     Petitioner alleges that the State improperly used Dr. Frankie Preston as an expert at trial and that the court should have struck any such testimony from the record because at the time of trial, Petitioner alleges that Dr. Preston did not possess a doctoral degree. (Allegation 5).

6.     Petitioner alleges that the trial court erred in permitting, during the guilt phase of the trial, Dr. Lawrence Maier to state his opinion of Petitioner's mental condition at the time of the commission of the offense due to Dr. Maier relying on information he received from Dr. Frankie Preston, because, Petitioner alleges Dr. Preston did not possess a doctoral degree. (Allegation 6).

7.     Petitioner alleges that the trial court erred in denying Petitioner's motion to suppress his statements to the police. Petitioner further alleges that even though this issue was raised on appeal, it should be reconsidered in order to see if the appeals courts were in error. (Allegation 7).

8.     Petitioner alleges that the trial court erred in denying his motion for judgment of acquittal because the weight of the evidence showed that Petitioner was insane at the time of the offense. Petitioner further alleges that even though this issue was raised on appeal, it should be reconsidered in order to see if the appeals courts were in error. (Allegation 8).

9.     Petitioner alleges that he was denied his Sixth Amendment right to effective assistance of counsel. In particular, Petitioner alleges that his trial counsel's and his appellate counsel's performances were ineffective because counsel:

A)      Failed to raise, at trial and on appeal, issue of whether trial court should have conducted a competency hearing during the course of the trial.

B)      Failed to object to prosecutor's comment in opening.

C)      Failed to raise, at trial or on appeal, whether Petitioner had a right to have his medication suspended during the trial.

D)      Failed to raise, at trial or on appeal, whether Petitioner was entitled to an instruction that his state of mind at trial was chemically induced and not reflective of his state of mind at the time of the murder.

E)      Failed to raise, at trial and on appeal, the issue of Dr. Frankie Preston's qualifications to testify as an expert for the State.

F)      Failed to challenge, at trial or on appeal, the standard used for overturning a jury's verdict in a case where a defendant pleads not guilty by reason of mental disease or defect.

G)      Failed to argue, at trial or on appeal, that the doctor who gave his opinion about Petitioner's mental condition improperly relied on his conversation with Dr. Frankie Preston.

H)      Failed to properly raise, at trial, whether the investigator could testify to Defendant's mental state at the time his statements were taken.

I)      Failed to properly raise, at trial, whether the investigator could testify that Defendant did not have permission to enter the victim's residence.

J)      Failed to properly raise, at trial, whether the trial judge improperly excluded as hearsay testimony of Petitioner's mother regarding a diagnosis that he suffered from a mental illness.

K)      Failed to properly raise, at trial, whether the trial court erred in allowing Dr. Preston to testify concerning Petitioner's mental state at the time Dr. Preston saw him on July 24, 1990.

L)      Failed to properly raise, at trial, whether the prosecutor could tell the jury to write to her boss if they did not like the way another case was handled.

4

> M)      Failed to raise, on appeal, all the facts and case law
>           regarding the trial court's denial of his motion to
>           suppress his statements.
>
> N)      Failed to raise, on appeal, all the facts and case law
>           regarding the trial court's denial of his motion for
>           judgment of acquittal.
>
> O)      Failed to timely appeal Petitioner's transfer order.

(Click Ex. Q at 4).

The state responded to Click's Rule 32 petition on December 4, 1998.  (Click Ex. Q at 1, 140).  After conducting an evidentiary hearing, the trial court entered its order denying Click's petition on January 8, 1999.  (*Id*. at 1, 153-57).  Click appealed the denial of the Rule 32 petition to the Alabama Court of Criminal Appeals.  (Respondents Ex. D).  On August 27, 1999, the Alabama Court of Criminal Appeals held that the circuit court erred in not addressing all of Click's ineffective assistance of counsel claims and remanded the case to the circuit court with directions to address the remainder of Click's substantive claims and make specific, written findings of fact concerning all of the appellant's ineffective assistance of counsel claims.  *See Click v. State*, CR-98-0861, 1999 WL 669423, at *1 (Ala. Crim. App. 1999).  On December 21, 2000, the Madison County Circuit Court entered its order denying Click's Rule 32 petition and specifically addressing all of his ineffective assistance of counsel claims.  (Click Ex. K).  On April 20, 2001, the Alabama Court of Criminal Appeals affirmed the denial of Click's Rule 32 petition in a written opinion.  (Click Ex. L).  Click again petitioned the Supreme Court of Alabama for a writ of certiorari, which the court denied on November 16, 2001.  (Respondents Ex. E; Click Ex. O).

The petitioner filed the present application for a writ of habeas corpus on December 14,

2001, raising the following claims:

    I.      The trial court and the Alabama Court of Criminal Appeals erred in their procedural holdings.

    II.     The Alabama Court of Criminal Appeals used the wrong standard of review for Shane Click's ineffective assistance of counsel claims.

    III.    Shane Click's attorneys provided ineffective assistance of counsel during their representation before the juvenile court, before the trial court, and on appeal.

        (1)    It was improper for the prosecutor to strike jurors #68 and #55 at Shane's capital murder trial because of their religion.  Shane's trial and appellate attorneys were ineffective for failing to raise the issue.

        (2)    Shane Click's trial and appellate attorneys were ineffective for failing to raise the issue that Frank Preston, a counselor, was not qualified to testify regarding whether Shane Click was able to appreciate the nature and quality or wrongfulness of his actions at the time of Miss McClure's murder.

        (3)    Jimmy Shane Click was incompetent to stand trial in violation of both his procedural and substantive due process rights.  In addition, Jimmy Shane Click's trial and appellate counsel were ineffective for failing to raise the claim that he was incompetent to be tried.

        (4)    The prosecutor improperly commented on Jimmy Shane Click's Fifth Amendment right to remain silent.  Therefore, Jimmy Shane Click's trial and appellate counsel were ineffective for failing to raise this claim.

        (5)    The trial court erred in allowing Preston to testify concerning his opinion of Shane's mental state at the time he saw Shane on July 24, 1990.  However, the Court of Criminal Appeals held that Shane's attorneys failed to preserve this issue for appeal.  Therefore, they were ineffective for not doing so.

        (6)    Shane's appellate attorneys argued that the trial court erred in permitting Dr. Lawrence Maier to state his opinion of Shane's mental condition at the time of the offense during the guilt phase of trial due to Dr. Maier relying on information he received from others and on information that was not in evidence to reach his opinion.  Shane's appellate attorneys were

ineffective to the extent that they failed to point out that Preston was not a medical expert who could not be relied upon. Moreover, Shane's trial and appellate attorneys failed to properly preserve and argue the issue that Dr. Lawrence Maier improperly relied on police reports and on Shane's co-defendant's statements in arriving at his opinion.

(7)     Shane's trial and appellate attorney argued that the trial court erred in excluding the testimony of his mother, Cathy Lambert, that he had been diagnosed as suffering from mental illness, on the basis that it was hearsay. The court of criminal appeals held that Shane's attorneys failed to preserve the issue for appeal. Therefore, they were ineffective for not doing so.

(8)     Shane's appellate attorneys argued that the trial court erred in allowing the prosecutor to tell the jury to write her boss if they did not like the way the co-defendant's case was handled. However, the Court of Criminal Appeals held that Shane's attorneys failed to preserve this issue for appeal. Therefore, they were ineffective for failing to do so.

(9)     Shane's appellate attorneys also argued that the prosecutor's statement that, in her personal opinion, it looked to her like he had been doing street drugs long before he knew the victim, was inappropriate opinion testimony by the prosecutor. However, the Court of Criminal Appeals held that Shane's attorneys failed to preserve this issue for appeal. Therefore, they were ineffective for failing to do so.

(10)    Shane's appellate attorneys argued that the trial court erred in denying Shane Click's motion to suppress the statements to the police. The Alabama Court of Criminal Appeals denied this issue. However, it is respectfully submitted, based upon the new evidence presented in the Rule 32, that Shane Click is entitled to relief on this issue. Morever, Shane Click's attorneys would be ineffective for failing to properly address this issue.

(11)    Shane's appellate attorneys argued that the trial court erred in denying his motion for a judgment of acquittal because the great weight of the evidence proved that he was insane at the time of the offense. His attorneys were correct in making this argument. Therefore, Shane is asking the court to reconsider this issue because it was previously raised and determine whether the court's previous decisions were in error. In the alternative, Shane's attorneys were ineffective on this issue to the extent

7

that his attorneys did not present all the facts and case law.

IV.   The Alabama Appellate Courts have erred in holding that the Fifth Amendment privilege against self-incrimination ends after a person has had a trial and exhausted his ditect [sic] appeals.

    A.   The Fifth Amendment claim.

    B.   The State has no legitimate interest in compelling Shane's Testimony in order to assess the reasonableness of trial counsel's performance.

    C.   Shane Click is not competent to testify about either the reasonableness of his trial attorney's performance or what could have been added to his defense at trial.

V.   The following issues that were raised and denied on Shane Click's direct appeal also show that his first, fourth, fifth, sixth, eighth, and fourteenth amendment rights of the United States Constitution were violated.

    A.   The appellant contends that the trial court erred in denying his motion to suppress his statement to the police. . . .

    B.   The appellant argues that the trial court erred in denying his *Batson v. Kentucky* . . . motion . . . .

    C.   The appellant argues that the trial court erred in denying his motion for a judgment of acquittal because, he says, that the great weight of the evidence proved that he was insane at the time of the offense. . . .

(Doc. 1).[8]

## FACTUAL BACKGROUND

The petitioner was convicted of capital murder for the death of Ginger Roberta McClure. During the late evening hours of July 24, 1990, the petitioner and codefendant Scott Carpenter broke and entered into McClure's home.  Click sprayed mace into her face as McClure slept in

---

[8]For purposes of clarity, the court has identified the issues presented using the lettering and numbering in Click's petition.

her bed and Carpenter struck her with a baseball bat.  Charlene Bottorff, a friend of the petitioner

and Carpenter's girlfriend, testified that the petitioner and Carpenter had been discussing and

planning the crime for at least a week before they carried it out.  (R. at 273-85).[9]  According to

Bottorff, the plan was to have Click go to McClure's home, locate her gun, and then return the

next day for Carpenter to shoot her.  (R. 287-88).

On July 24, 1990, the petitioner told Carpenter that he was unable to locate the gun at

McClure's house.  According to Bottorff, the petitioner then devised an alternate plan where they

would get a baseball bat and Carpenter would hide in the bushes of McClure's house while the

petitioner and Shawn Sato mowed her grass, waiting for the petitioner's signal to enter.  The

petitioner would then spray McClure with tear gas and Carpenter would hit her with the baseball

bat.  (R. 289-90).

Bottorff, Carpenter, and the petitioner bought a can of tear gas at an army supply store.

They then met Sato at a gas station on Highway 72 so that the petitioner and Sato could go to

mow McClure's lawn.  (R. 290-91).  After arriving at the gas station, the group continued

discussing the plan to kill McClure.  While Sato was mowing the grass, the petitioner was

supposed to turn the music up so that no one could hear anything.  Bottorff was supposed to drop

Carpenter off near McClure's house so that he could sneak through the woods, hide behind

McClure's house, and then come up to startle her from behind.  The petitioner would spray her

with the tear gas and then Carpenter would beat her with the baseball bat until she was dead.  (R.

292-94).

The petitioner gave Carpenter a blue tote bag holding binoculars, tear gas, a baseball bat,

---

[9]References herein to "R. at _____" are to the trial transcript located at Click Ex. P.

sticks, and camouflage overalls.  After taking the tote bag, Carpenter and Bottorff got out of the petitioner's car and back into Bottorff's car and the petitioner drove to McClure's house. Bottorff drove Carpenter to a Texaco Station and dropped him off with the blue tote bag.  (R. 294-96).

Bottorff, Sato, Carpenter, and the petitioner met that night around 10:00 p.m. at Bottorff's mother's house.  The initial plan was foiled due to some unexpected visitors at McClure's house. The petitioner stated that he hid Carpenter in the trunk of his car and they left.  When Carpenter, Bottorff, and the petitioner drove Sato home around 10:30 p.m., the petitioner again discussed killing McClure.  (R. 297-301).  According to Bottorff, Click directed her to drive Carpenter and Click to a location close to McClure's house and drop them off, which she did around 11:00 or 11:30 p.m.  She was told to wait by a pay phone at a local motel until they called her to pick them up.  If they did not call by a certain time, she was to pick them up at a pre-arranged site.  (R. 301-05).

Bottorff testified that when she picked Carpenter and the petitioner up after 1:00 a.m., both had blood all over their arms.  Bottorff also stated that the petitioner told Carpenter that he had "done a real good job" hitting McClure.  The petitioner then stated that it took McClure about an hour or so to die and that she kept making gurgling noises.  One of the men stated that the petitioner had sprayed her with mace and Carpenter hit her when she sat up.  (R. 306-11). The group hid some items taken from McClure's home at various places in Huntsville and then went to Bottorff's apartment to sleep.  (R. 312-15).

Shawn Sato recalled the petitioner mentioning plans to kill McClure but did not take the petitioner seriously.  Sato testified that he saw Carpenter in the woods as he mowed McClure's

grass.  After he and the petitioner finished mowing the backyard and prepared to leave, he discovered Carpenter in the trunk of the car.  (R. 760-72).  The morning after the murder, the petitioner told Sato what they had done, including telling Sato that he and Carpenter went into the house and that Carpenter hit her with the bat while the petitioner sprayed her with mace.  (R. 775-76).  The petitioner and Sato later went to K-Mart to purchase a cooler in which they placed some of McClure's property and buried it in the woods.  (R. 772-77).

Susanne Fike discovered McClure's body around 3:00 p.m. on July 25, 1990.  (R. 221-27).  Dr. Joseph Embry performed the autopsy and stated that McClure's head was misshapen due to multiple skull fractures.  She had extensive trauma injuries to her head including a four inch tear across her forehead extending in depth to the bone.  McClure also had a one and one half inch laceration in the lower left part of her forehead extending into the outside part of her left eyebrow that extended in depth down to the bone.  She sustained other numerous fractures.  Dr. Embry stated that the victim had sustained several defense injuries and concluded the she died as a result of a blunt-force trauma to the head.  (R. 461-67).

The police questioned Click based upon information that he and Sato had been seen at McClure's house on the evening of the murder.  (R. 440-45).  During subsequent questioning, the police determined that the petitioner fit the description of a person who had been seen in the woods behind McClure's house on the day of the crime.  After being informed of his rights, the petitioner admitted that he sprayed McClure with mace before Carpenter beat her to death.  He also stated that he and Carpenter took money, drugs, and other items from the home.  (R. 675-83).  After giving his statement, Click also offered to take investigators to the locations where McClure's property was hidden.  (R. 683).  Forensic scientists matched blood and fiber

samples from Mcclure and her house to the shoes and clothing of both the petitioner and

Carpenter.  (R. 411, 424-25, 643-47).

## STANDARD OF REVIEW ON THE MERITS

The Eleventh Circuit Court of Appeals recently articulated the applicable standard of

review of a final Rule 32 order in *Stephens v. Hall*, 407 F.3d 1195 (11th Cir. 2005), *cert. denied*,

___U.S.___, 126 S. Ct. 278 (2005).  In pertinent part, the court stated:

> Because we are reviewing a final state habeas judgment, "our review is
> greatly circumscribed and is highly deferential to the state courts" under section
> 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996.
> *Crawford v. Head*, 311 F.3d 1288, 1295 (11th Cir. 2002). . . .  A federal court may
> not grant habeas relief unless the decision of the state court either was "contrary
> to, or involved an unreasonable application of, clearly established Federal law, as
> determined by the Supreme Court of the United States" or "was based on an
> unreasonable determination of the facts in light of the evidence presented in the
> State court proceeding."  28 U.S.C. § 2254(d).

> Our review of findings of fact by the state court is even more deferential
> than under a clearly erroneous standard of review.  "[A] determination of a factual
> issue made by a State court shall be presumed to be correct.  The applicant shall
> have the burden of rebutting the presumption of correctness by clear and
> convincing evidence."  *Id.* § 2254(e).

> Our review of legal conclusions by the state courts is also especially
> deferential.  A state court decision is contrary to the clearly established precedent
> of the Supreme Court "(1) if the state court applies a rule that contradicts the
> governing law as set forth in Supreme Court case law, or (2) if the state court
> confronts a set of facts that are materially indistinguishable from those in a
> decision of the Supreme Court and nevertheless arrives at a result different from
> Supreme Court precedent."  *Bottoson v. Moore*, 234 F.3d 526, 531 (11th Cir.
> 2000) (citing *Williams v. Taylor*, 529 U.S. 362, 406, 120 S. Ct. 1495, 1519-20,
> 146 L. Ed. 2d 389 (2000)).  An unreasonable application of federal law occurs
> when the state court "identifies the correct legal rule from Supreme Court case
> law but unreasonably applies that rule to the facts of the petitioner's case" or
> "unreasonably extends, or unreasonably declines to extend, a legal principle from
> Supreme Court case law to a new context."  *Putman v. Head*, 268 F.3d 1223,
> 1241 (11th Cir. 2001).

12

Under the unreasonable application clause of section 2254(d), a federal habeas court may not issue the writ on the ground that, in its independent judgment, the state court applied federal law incorrectly. *See Bell v. Cone*, 535 U.S. 685, 698-99, 122 S. Ct. 1843, 1852, 152 L. Ed. 2d 914 (2002). This clause imposes a "'highly deferential standard for evaluating state-court rulings,' which demands that state-court decisions be given the benefit of the doubt." *Woodford v. Visciotti*, 537 U.S. 19, 24, 123 S. Ct. 357, 360, 154 L. Ed. 2d 279 (2002) (quoting *Lindh v. Murphy*, 521 U.S. 320, 333 n.7, 117 S. Ct. 2059, 2066 n.7, 138 L. Ed. 2d 481 (1997)). The habeas applicant must show that the state court applied federal law to the facts of his case in an objectively unreasonable manner. *See id*. at 25, 123 S. Ct. at 360. An "unreasonable application of federal law is different from an incorrect application of federal law." *Williams*, 529 U.S. at 410, 120 S. Ct. at 1522. Even clear error, standing alone, is not a ground for awarding habeas relief. *See Lockyer v. Andrade*, 538 U.S. 63, 75, 123 S. Ct. 1166, 1175, 155 L. Ed. 2d 144 (2003).

*Stephens*, 407 F.3d 1201-02.

## ANALYSIS OF INDIVIDUAL CLAIMS

### CLAIM I:  TRIAL COURT AND ALABAMA COURT OF CRIMINAL APPEALS ERRED IN THEIR PROCEDURAL HOLDINGS

The petitioner asserts that the state trial and appeals courts erred in their procedural holdings when they ruled that the petitioner procedurally defaulted allegations 1-8 of his Rule 32 petition because they could have been raised at trial or on appeal because the petitioner was represented by the same counsel at trial and on appeal.  The court agrees with the respondents that this claim is not a separate and distinct claim for habeas corpus relief.  However, to the extent the issue is properly before the court, it will be addressed herein along with the petitioner's other claims.

### CLAIM II:  ALABAMA COURT OF CRIMINAL APPEALS USED THE WRONG STANDARD OF REVIEW FOR THE INEFFECTIVE ASSISTANCE OF COUNSEL CLAIMS

The petitioner asserts that the appellate court used the wrong standard of review for his

ineffective assistance of counsel claims and that the court should have applied a de novo standard

of review.  The respondents retort that the claim is not cognizable in a federal habeas corpus

proceeding and thus this court does not have subject matter jurisdiction to entertain it pursuant to

28 U.S.C. § 2254.  The respondents also contend that this claim is not cognizable because it is

unrelated to the cause or the constitutionality of his detention.  To the extent this issue is properly

before the court, it will be addressed herein along with the petitioner's ineffective assistance of

counsel arguments.

### CLAIM III:  INEFFECTIVE ASSISTANCE OF COUNSEL

The guidepost for evaluating the substance of any ineffective assistance of counsel claims

is *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), wherein the

Court formulated the two-prong test for assessing whether the representation provided by an

attorney during criminal trial proceedings constitutes "ineffective" representation under the Sixth

Amendment.  The Court wrote that

> [a] convicted defendant's claim that counsel's assistance was so defective as to
> require a reversal of a conviction or death sentence has two components.  First,
> the defendant must show that counsel's performance was deficient.  This requires
> showing that counsel made errors so serious that counsel was not functioning as
> the "counsel" guaranteed that defendant by the Sixth Amendment.  Second, the
> defendant must show that the deficient performance prejudiced the defense.  This
> requires showing that counsel's errors were so serious as to deprive the defendant
> of a fair trial, a trial whose result is reliable.  Unless a defendant makes both
> showings, it cannot be said that the conviction or death sentence resulted in a
> breakdown of the adversary process that renders the result unreliable.

*Strickland*, 466 U.S. at 687.  Generally, an ineffective assistance of appellate counsel claim is

analyzed under this two-pronged *Strickland* test.  *See Heath v. Jones*, 941 F.2d 1126, 1130 (11th

Cir. 1991), *cert. denied*, 502 U.S. 1077, 112 S. Ct. 981, 117 L. Ed. 2d 144 (1992).  To prove his

ineffective assistance claims, the petitioner is thus required to meet both the performance and prejudice prongs of the *Strickland* test, which is difficult.  As the Eleventh Circuit has noted, "the cases in which habeas petitioners can properly prevail on the ground of ineffective assistance of counsel are few and far between."  *Rogers v. Zant*, 13 F.3d 384, 386 (11th Cir.), *cert. denied*, 513 U.S. 899, 115 S. Ct. 255, 130 L. Ed. 2d 175 (1994).

Meeting the first prong is difficult because "[j]udicial scrutiny of counsel's performance must be highly deferential," and courts must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."  *Strickland*, 466 U.S. at 689.  In discussing the first prong of *Strickland*, the Eleventh Circuit has stated as follows:

> The Supreme Court has mandated a highly deferential review of counsel's conduct, especially where strategy is involved.  *Strickland v. Washington*, 466 U.S. 668, 689-90, 104 S. Ct. 2052, 2065-66, 80 L. Ed. 2d 674 (1984).  Intensive scrutiny and second-guessing of attorney performance are not permitted.  *Id.*; *accord, e.g.*, *Atkins v. Singletary*, 965 F.2d 952, 958 (11th Cir. 1992) ("Most important, we must avoid second-guessing counsel's performance."); *White v. Singletary*, 972 F.2d 1218, 1220 (11th Cir. 1992) ("Courts also should at the start presume effectiveness and should always avoid second-guessing with the benefit of hindsight.").  Because it is a "wide range" of performance that is constitutionally acceptable, "the cases in which habeas petitioners can properly prevail on the ground of ineffective assistance of counsel are few and far between."  *Rogers v. Zant*, 13 F.3d 384, 386 (11th Cir. 1994).  Cases in which deliberate strategic decisions have been found to constitute ineffective assistance are even fewer and farther between.

*Spaziano v. Singletary*, 36 F.3d 1028, 1039 (11th Cir. 1994), *cert. denied*, 513 U.S. 1115, 115 S. Ct. 911, 130 L. Ed. 2d 793 (1995).

To meet the second prong, the petitioner "must show that there is a reasonable probability

that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.[10]  A reasonable probability is "a probability sufficient to undermine confidence in the outcome."  *Id*.

### (1) Failing to object to prosecutor striking jurors 68 and 55 on the basis of their religious beliefs

Click first asserts that his counsel was ineffective for failing to raise a claim that the prosecution improperly struck jurors 68 and 55 on the basis of their religious beliefs.  (Petition at 94).  On this claim, the Alabama Court of Criminal Appeals held that:

> The State's reasons for striking juror number 68 were that he had a past assault conviction and that he had studied for the ministry.  We have repeatedly held that a veniremember's connection with or involvement in criminal activity may serve as a race-neutral reason for striking that veniremember . . .  In addition, the fact that number 68 had studied for the ministry concerned the State with regard to his views on the death penalty.  The fact that a veniremember is a preacher, pastor, or minister may constitute a sufficient reason for a peremptory strike . . .  Although the veniremember's prior assault conviction is a much more legitimate reason for striking him than the other, both reasons given by the State are sufficiently clear, specific, and race-neutral to support our affirmance of the trial court's decision with regard to juror number 68.

*Click*, 695 So. 2d at 220.

The petitioner states that this holding is in violation of *Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986), *Powers v. Ohio*, 499 U.S. 400, 111 S. Ct. 1364, 113 L. Ed. 2d 411(1991), the First Amendment, the Fourteenth Amendment, and §§ 12-16-55 and 12-16-56 of the Alabama Code.

---

[10]In certain limited circumstances, prejudice is presumed.  *Strickland*, 466 U.S. at 692.  The petitioner argues that this should be one of those limited circumstances.  (Doc. 11 at 93).  However, the "certain limited circumstances" that *Strickland* refers to are "actual or constructive denial of the assistance of counsel altogether" and "various kinds of state interference with counsel's assistance."  Additionally, a more limited presumption may apply where an actual conflict of interest exists.  However, "conflict of interest claims aside, actual ineffectiveness of counsel claims alleging a deficiency in attorney performance are subject to a general requirement that defendant affirmatively prove prejudice."  *Id*.  Clearly, this case is not one of those "certain limited circumstances" and, as such, the petitioner must "affirmatively prove prejudice."

Aside from the blanket assertion that the decision reached by the Alabama Court of Criminal Appeals was contrary to federal law, the petitioner fails to show how that decision "was contrary to, or involved an unreasonable application of, clearly established Federal law as determined by the Supreme Court of the United States" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d)(1) and (2). As such, the petitioner has failed to show that his counsels' conduct was deficient with regards to this claim and that he was prejudiced by any such alleged deficiency. [11]

_____

[11]The respondents assert that the petitioner's claim regarding juror 55 is procedurally defaulted because he failed to mention juror 55 in his state court petition. (Doc. 9 at 32). In discussing procedural default, the Eleventh Circuit has stated as follows:

> The federal courts' authority to review state court criminal convictions pursuant to writs of habeas corpus is severely restricted when a petitioner has failed to follow applicable state procedural rules in raising a claim, that is, where the claim is procedurally defaulted. Federal review of a petitioner's claim is barred by the procedural default doctrine if the last state court to review the claim states clearly and expressly that its judgment rests on a procedural bar, *Harris v. Reed*, 489 U.S. 255, 263, 109 S. Ct. 1038, 1043, 103 L. Ed. 2d 308 (1989), and that bar provides an adequate and independent state ground for denying relief. *See id.* at 262, 109 S. Ct. at 1042-43; *Johnson v. Mississippi*, 486 U.S. 578, 587, 108 S. Ct. 1981, 1987, 100 L. Ed. 2d 575 (1988). The doctrine serves to ensure petitioners will first seek relief in accordance with state procedures, *see Presnell v. Kemp*, 835 F.2d 1567, 1578-79 (11th Cir. 1988), *cert. denied*, 488 U.S. 1050, 109 S. Ct. 882, 102 L. Ed. 2d 1004 (1989), and to "lessen the injury to a State that results through reexamination of a state conviction on a ground that a State did not have the opportunity to address at a prior, appropriate time." *McCleskey v. Zant*, 499 U.S. 467, 111 S. Ct. 1454, 1470, 113 L. Ed. 2d 517 (1991).

*Johnson v. Singletary*, 938 F.2d 1166, 1173 (11th Cir. 1991), *cert. denied,* 506 U.S. 930, 113 S. Ct. 361, 121 L. Ed. 2d 274 (1992). Thus, a federal habeas court generally may not review a claim if the claim has been presented in some form to a state court, and the last state court rendering a judgment in the case "'clearly and expressly' states that its judgment rests on a state procedural bar," which bar provides an independent and adequate state ground to deny relief. *Harris*, 489 U.S. at 262-63.

A petitioner may overcome a procedural default in one of two ways. First, under the "cause and prejudice" exception, he can "demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law." *Coleman v. Thompson*, 501 U.S. 722, 750, 111 S. Ct. 2546, 2565, 115 L. Ed. 2d 640, 669 (1991). Second, under the "fundamental miscarriage of justice" exception, he "can demonstrate a sufficient probability that our failure to review his federal claim will result in a fundamental miscarriage of justice." *Edwards v. Carpenter*, 529 U.S. 446, 451, 120 S. Ct. 1587, 1591, 146 L. Ed. 2d 518, 524 (2000). The latter exception allows a federal habeas court to consider a procedurally defaulted claim in the absence of cause if a "fundamental miscarriage of justice" has "probably resulted in the conviction of one who is actually innocent," or where the petitioner shows "by clear and convincing evidence that but for a constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty." *Schlup v. Delo*, 513 U.S. 298, 323-27 n.44, 115 S. Ct. 851, 865-66 n.44, 130 L. Ed. 2d 808, 833-36 n.44 (1995) (quoting *Sawyer v. Whitley*, 505 U.S. 333, 336, 112 S. Ct. 2514, 2517, 120 L. Ed. 2d 269 (1992)); *Smith v. Murray*, 477 U.S. 527, 537-38, 106 S. Ct. 2661, 2668, 91 L. Ed. 2d 434 (1986) (quoting, respectively, *Isaac v. Engle*, 456 U.S. 107, 135, 102 S. Ct. 1558, 71 L. Ed. 2d 783 (1982) and *Murray v. Carrier*, 477 U.S. 478, 496, 106 S. Ct. 2639, 91 L. Ed. 2d 397 (1986)).

### (2)        Failing to object to Preston's qualifications

The petitioner next asserts that counsel was ineffective for failing to raise the issue that

Frank Preston, a counselor, was not qualified to testify regarding whether the petitioner was able

to appreciate the nature and quality of the wrongfulness of his actions at the time of the murder.

Concerning Preston, there is dispute as to whether or not the jury and the courts were under the

impression that he was a licensed psychologist in the state of Alabama and that such a distinction

makes a difference in the weight of his testimony.  Preston treated the petitioner until the night of

the killing, and Preston testified that the petitioner was not insane at the time of the murder.  The

petitioner asserts that if his "own doctor" did not believe him to be insane, the jury would take

this opinion to be true based on his being a doctor.  (Petition at 101).  The petitioner further

asserts that because Preston was not a licensed psychologist in Alabama at the time of his

testimony, he was not qualified to testify as an expert concerning petitioner's insanity.  (*Id*. at

101-02).

The Alabama Court of Criminal Appeals found as follows:

---

It appears that the respondents may be correct that the petitioner is procedurally barred from raising this claim here because it is procedurally barred.  It is barred because it was raised for the first time in the petition for writ of certiorari in the Alabama Supreme Court.  This is improper because petitions for writ of certiorari are intended to review the decisions of the Courts of Appeal not for the raising of new issues that have not previously been presented.  ALA. R. APP. P. 39.  The petitioner cannot raise this claim at this juncture without presenting the same to the state courts in a recognizable fashion.  His arguments that the appellate courts are required to take judicial notice of the record from a direct appeal (doc. 11 at 3), is unconvincing.  In fact, it would do away with the requirement that the petitioner properly present his cognizable claims to the state courts with adequate specificity.  *See, e.g., Castille v. Peoples*, 489 U.S. 346, 109 S. Ct. 1056, 103 L. Ed. 2d 380 (1989) (raising an issue for the first time on a petition to the Pennsylvania Supreme Court for allocatur was not "fair presentation" of the claim for purposes of the exhaustion requirement).

Even assuming for the sake of argument that the claim regarding juror 55 is not procedurally barred, this court finds that it still does not provide a basis for habeas relief.  First, the United States Supreme Court has not extended *Batson* in situations such as this.  *See* 28 U.S.C. § 2254(d)(1).  Second, the record demonstrates that the prosecutor articulated numerous reasons for striking juror 55, including that he was "uncertain about the death penalty and had mixed feelings in association with it;" he was "uncertain, showed uncertainty, with regard to the burden of proof that the defense has with regard to the insanity issue"; he "was skeptical about accomplice testimony;" and, another juror was a friend of his.  (Doc. 12 at 14).

The testimony reveals . . . that prior to his testimony at trial, Dr. Preston had received bachelor and master's degrees in psychology and Doctor of Psychology degrees from two different institutions.  This "doctor of psychology" degree is, indeed, different from a Ph.D. in psychology, but involves specialized advanced study in the area of psychology.

According to *McElroy's Alabama Evidence* (5th), § 127.02(2), "to qualify as an expert, the witness [must] have such knowledge, skill, experience, or training that his opinion will be of aid or assistance to the trier of fact."  This section also provides that expertise may be established through experience in addition to formal education.  Dr. Preston, at the evidentiary hearing, testified that he worked for several years with the Madison County Mental Health Center doing forensic evaluations.  Moreover, he had not one, but two Doctor of Psychology degrees.  Furthermore, he had significant contacts with petitioner during the time of the murder and during the period immediately before the murder.

Typically, in the criminal process, mental health professionals don't get a chance to evaluate an accused until months, sometimes years, after an offense occurs.  In this case, a person with psychology training, several years of counseling practice, and experience doing forensic evaluations happened to be in a position to observe the petitioner at the time of the occurrence of the offense in question and render an opinion as to that mental state at trial.  Ultimately much discretion is accorded the trial court as to the question of whether or not a witness is qualified as an expert.  Gamble, *McElroy's Alabama Evidence* (5th), § 127.02(3).  By way of derivation from this principle, the Court finds that, as a result of the combination of his education, training, experience, and relevant personal contact with the petitioner, Dr. Frankie Preston was sufficiently qualified as an expert to render an opinion as to petitioner's mental state at the time of the offense.

Moreover, in Alabama, even a lay witness may give his or her opinion as to the sanity or not of a defendant so long as the proper predicate has been laid. *Ex parte Lee*, 506 So. 2d 301 (Ala. 1987).  Among the predicate requirements are that the witness has had sufficient opportunity to observe the defendant and form an opinion as to his mental state.  Even if Dr. Preston is deemed unqualified to provide an expert opinion, he certainly had sufficient relevant professional contacts with the petitioner, including an appointment on the day of the murder, to qualify to give an opinion, in rebuttal, as to petitioner's mental state at the time of the offense.  Gamble, *McElroy's Alabama Evidence* (5th), § 128.01, 128.

Though Dr. Preston was not licensed in Alabama as a psychologist, he still has an

extensive educational background in the field and can therefore be qualified as an expert based on that knowledge, skill, experience, training, and education.  The petitioner's counsel would not have been able to dispute his educational background and training, as Dr. Preston testified to the education he had received.  Dr. Preston did not testify that he was a licensed psychologist at the time of the murder, indeed he testified that he was licensed in Alabama in 1997 and that at the time he was treating the petitioner and at the time of trial he was a licensed professional counselor.  There is no evidence substantiating the petitioner's claim that the jury and the courts were under the impression that Preston was licensed in Alabama at the time of the trial.  This issue is evidentiary in nature and turns on whether or not Preston was qualified under the Alabama evidentiary rules to testify as an expert.  Based on his education, experience, and contact with the petitioner, Preston was qualified to testify as to Click's appreciation of the nature and quality or wrongfulness of his actions at the time of the murder.  Accordingly, any claim that the petitioner's counsel was ineffective for failing to object to his qualifications is without merit.[12]  To the contrary, the petitioner's trial counsel put on its own experts with opinions contrary to Preston's from people with more impressive credentials than Preston's.[13]

---

[12]The petitioner also asserts that Preston testified that he took the petitioner off his Lithium and that Preston is not qualified to control a patient's medication.  However, the portion of the transcript that the petitioner refers to in support of this assertion appears to be in error.  On page 1118 of the trial transcript, Preston's testimony is that "he had - - I had discontinued his lithium and it wasn't until the 11th that I saw his mother."  On page 1119, however, Preston's testimony is that he "saw Shane on the 13th and he had expressed that he had discontinued the Lithium."  Later in his testimony, Preston also stated that he had no contact with the petitioner from April 18th until June 16th and that during that time frame he had discontinued the Lithium.  Additionally, Dr. Mary Traynor testified that she took Click off his Lithium after a May visit because he was not having any active psychotic symptoms.  (R. 1086-90).  Based upon the totality of the testimony, the language quoted from page 1118 appears to be a misstatement made by Preston.

[13]The testimony of psychiatrist Dr. James Merikangas is in the record at 949-1038 and the testimony of Ph.D. psychologist Dr. David Rush is in the record at 921-42.

**(3)      Failing to claim Click was incompetent to stand
trial and failing to raise that claim on appeal**

The petitioner next asserts that his counsel was ineffective for failing to raise the claim

that he was incompetent to stand trial in violation of his procedural and substantive due process

rights.  (Petition at 105).  The Alabama Court of Criminal Appeals concluded that the Rule 32

hearing did not show any reason that trial counsel should have suspected that Click was

incompetent to stand trial.  The Court stated that:

> Trial counsel, Mark McDaniel and William Burgess, are experienced
> criminal defense attorneys, with more than thirty-five years combined experience
> as of the commencement of Jimmy Shane Click's trial.  Each testified that he
> lacked reasonable grounds to believe that Click was incompetent to stand trial
> before or during the trial.  Both McDaniel and Burgess testified that Click seemed
> oriented and aware of the nature of the proceedings and able to assist them in
> conducting a defense.  Both attorneys testified that Click was given instructions to
> "look down" and not appear to be actively participating in the defense.  This was a
> strategic decision, designed to counter the State's contention that Click was the
> "mastermind" of the plot to murder the victim.
>
> The primary evidence of petitioner's incompetence was offered through
> his attorneys, Mark McDaniel and William Burgess, Dr. James R. Merikangas and
> two lay witnesses.  Dr. Merikangas based his opinion that petitioner was
> incompetent on records of psychotropic medications being administered to
> petitioner at or about the time of trial, his professional assessment of the effect of
> those drugs as creating a "chemical straightjacket," and his own observations of
> petitioner's demeanor while Merikangas was waiting to testify.  However, he
> admits that he did not speak with or examine the petitioner during this time.
>
> Dr. Merikangas acknowledges he never made a timely assessment of
> petitioner's level of responsiveness, actual orientation as to time and place, or
> ability to communicate effectively.  Nor did he assess petitioner's understanding
> of the proceedings and role of participants, petitioner's awareness of the
> consequences of a guilty verdict, or other factors relied upon when making a
> forensic assessment of competence to stand trial.
>
> . . . .

Witness David Leonard testified that he observed the petitioner with his head down on the table during the trial, but was unable to assess the level of awareness that petitioner had during the time.  Nor was he present during out-of-court counseling and strategy sessions between Click and his trial attorneys.  Attorney Bill Burgess testified that, although he observed Click with his head on the table at times during the trial, he never saw him asleep and, in his opinion was competent to assist in his defense throughout the proceedings. Furthermore, Burgess testified that there were times during the trial that Click reviewed material provided to him and times when Click asked questions concerning the trial.

Under Rule 1.1, Alabama Rule of Criminal Procedure, '[A] defendant is mentally incompetent to stand trial or to be sentenced for an offense if that defendant lacks sufficient present ability to assist in his or her defense by consulting with counsel with a reasonable degree of rational understanding of the facts and the legal proceedings against the defendant.'  The testimony offered by petitioner fails to show that, during the trial, petitioner lacked a reasonable degree of rational understanding of the facts and the legal proceedings.

Recalling petitioner's obligations under *Elliott* and *Wilson*, the court finds upon the evidence presented that, judged under prevailing professional norms, the performance of trial and appellate counsel as to the issue of petitioner's competence to stand trial was reasonable considering all the circumstances.

(Click Ex. L at 8-9).

Furthermore, the trial court did conduct a competency inquiry before the petitioner's trial.

Specifically, the court referred the petitioner to Lawrence R. Maier, Ph.D., Licensed Clinical

Psychologist, Certified Forensic Examiner.  Dr. Maier administered the Competency to Stand

Trial Assessment Instrument ("CAI") to measure the petitioner's knowledge and understanding

in areas related to trial competency.  In his assessment, Dr. Maier noted that:

Mr. Click demonstrates a high level of understanding as to the charge pending against him and as to its seriousness.  He clearly knows the meaning to both words of "Capital Murder" and also sufficiently understands the two penalty options of life without parole and death by electrocution.  His general perception of high conviction likelihood unless found not guilty by reasons of insanity is

22

realistic considering all that he knows and all that has transpired since the time of the crime.

As to his knowledge of courtroom participants, there are no deficiencies.  Defense counsel is to "help me"; prosecuting attorney "tries to send me up the river, (Q) [sic] gotta prove I'm guilty, (Q) [sic] he presents evidence".  A judge "sentences", a jury "decides guilt or innocence", a defendant is "me" (he knows his basic rights), and witnesses "testify to help either the prosecution or defense".  His understanding of basic courtroom procedure is better than most defendants and reflect his extensive experience over the past few years.  I see no significant difficulties in his ability to assist his attorneys in his own defense.  He understands the adversarial process; he demonstrates sufficient trust in his attorneys; there is nothing wrong with the amount of self-serving motivation present in a legal sense, and he is not likely to provide any appreciable disruption to courtroom proceedings, regardless of length, as long as he continues to take prescribed medicines.

Mr. Click is able to relate a fairly detailed and chronologically organized account of his behavior up to the time of the alleged crime and throughout most of the next day, including the time of his arrest and incarceration.  That his story and recollection differs at significant points from reviewed witness statements suggests self-protective efforts and is not unusual given his circumstances.  Thus, he does have the capacity to testify relevantly in his own defense if that is recommended by counsel and if defendant so chooses.

In all areas assessed, Mr. Click demonstrated no impairment and it is therefore my opinion that he does have the ability and capacity to understand and assist his attorneys, and that he has more than adequate factual and rational knowledge of the charge against him and consequences that can result if found guilty.  Thus, it is recommended that this defendant be returned to court to face the charge against him.

<u>Mental State at the Time of Offense</u>

The issue of Mr. Click's mental state at the time of the alleged offense was also considered in this evaluation.  The defendant's own statements about his thoughts, behavior, and feelings were considered along with all of the extensive material provided by Assistant District Attorney Ms. Moquin and the Mental Health history as provided by defense attorney Mr. Burgess, Jr.

It is my opinion that the symptoms of Mr. Click's mental illness were of minor

significance at the time of the murder.  Of much greater relevance is the high likelihood of acute cocaine intoxication fed by many hours of preceding marijuana and cocaine usage, the latter of which may have amounted to "a gram or a gram and a half".  There is also a likelihood that a "hit" of LSD had been consumed sometime before the crime.

Although Mr. Click now described his then mental state as one of detached "dissociation" with his behavior influenced by "IS", there is nothing that I could see in any of the written material that would support such phenomena.  None of the witness reports I read suggested anything psychotic in Mr. Click's pre-crime behavior, nor did witness description of post-crime behavior show anything strikingly unusual or of a psychotic nature.

Rather, a motivational state involving robbery, escape from a drug related debt, possible drug acquisition, and possibly even anger over a terminated relationship seem likely.  The pre-crime planning, the alleged attack itself, and the basic post-crime behavior are not the workings of one experiencing command hallucinations or "a dissociative state".  Drug caused disinhibition makes for a better explanation while the brutal violence of the act itself would not be inconsistent with other documented cases of drug-induced violence, particularly if LSD was consumed.  Unfortunately in this case, I know of no toxicological evidence to show support [sic] a possibility, although defendant himself admitted that he may have used LSD.  Apparently, there were traces of cocaine remaining in his system at the time of his initial interrogation.

In short, it is my opinion that the role of mental illness at the time of the crime was minimal but that severe drug usage and resultant intoxication brought about the courage, poor judgement, and excessive violence that reportedly occurred.  Were Mr. Click seriously mentally ill, there should have been signs noted by others between the time when the medicines stopped in May of 1990 and the time of the alleged crime in September of 1990.  Thus, there are not sufficient grounds to support a mental state defense, in my opinion.  If there was impairment of his basic understanding of the difference between right and wrong at the time of the crime, it was drug induced and not the result of mental illness symptomatology.

(Click Ex. Q (Supplement) at 142-44).

Dr. Maier's report was made on March 2, 1994, just three months prior to Click's trial.

This fact coupled with the present record and the Alabama Court of Criminal Appeals' finding

that "under prevailing professional norms, the performance of trial and appellate counsel as to the issue of the petitioner's competency to stand trial was reasonable considering all the circumstances," precludes the petitioner from effectively showing either that his counsel's performance was deficient or that he may have received a different result had his counsel acted any differently.  (Click Ex. K at 5-6).  As such, the petition is due to be denied as it pertains to his claim stemming from the issue of his competency.

The petitioner also asserts that "[t]he Constitutional threshhold of competence is met where the defendant has a rational and factual understanding of the proceedings against him, and is capable of rationally consulting with his lawyer about his defense.  *Dusky v. U.S.*, 362 U.S. 402 (1960)."  (Petition at 106).  The petitioner goes on to assert that "'when a trial court is faced with facts that create a reasonable and bona fide doubt as to the mental incompetency of the defendant to stand trial, the trial court must take steps to assure that a reasonable determination of competency is reached.'  *Ex parte Janezic*, 723 So. 2d 725 (Ala. 1997)."  (Petition at 108).

In the instant case, the trial court did exactly what the petitioner argues that it should have done.  The court sought the expert opinion of Dr. David Maier who undertook a competency evaluation of the petitioner and opined that he was competent to stand trial.  Although the petitioner asserts in his habeas petition that he slept during the trial, both of his trial counsel have testified to the contrary.  Specifically, Mr. McDaniel testified as follows:

A.   We did not claim he was incompetent at the time of trial.  I mean, based on our communications or my communications with him . . .  Shane is a very bright individual.  He has an IQ I think right at the genius level . . .  It is way up there.  He is an . . . exceptionally bright individual and in - - on medication, there was, you know, that was not an issue.  That was not an issue of his competence to stand trial.

. . . .

Q.      [W]as he able to consult with you about the case?

A.      Yes.

Q.      Did he seem to understand what was going on in the case?

A.      Yes.

. . . .

Q.      And, in fact, did you and Mr. Burgess direct Shane that he shouldn't consult with you very much during the course of the trial, in fact, he should probably sit with his head down during the trial?

A.      Yes, sir.

. . . .

Q.      Was there any point during the trial where you felt like he was unable to understand what was going on around him?

A.      No, sir.

(Rule 32 Tr. at 39-42).  Additionally, Mr. Burgess testified that:

The Court:      That was my question, did you observe him continuously sleeping while you were trying the case?

The Witness:   No.

Q.      Did you sit next to him?

A.      Yes.

Q.      Do you know if he had his head on the table?

A.      I know there was times he had his head on the table and I know there was times when he had his head up and I know there is times when he reviewed stuff we were giving him, I know that there were times when he asked me questions.

26

(*Id*. at 181).   Nonetheless, the petitioner asserts that his trial counsel were ineffective for not raising the claim that he was not competent to stand trial.   The court disagrees.   At the time of his trial, Click's counsel had before them Dr. Maier's opinion that he was competent to stand trial. Moreover, Click's trial counsel testified that Click asked questions of them and communicated throughout the trial in a manner that led them to believe he was, in fact, competent.

The petitioner has not presented anything in the instant petition that would show that the Alabama Court of Criminal Appeals' decision was contrary to or an unreasonable application of clearly established federal law or that it was an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.   Because the court has already found that trial counsel did not render ineffective assistance under *Strickland* with respect to the petitioner's competency, counsel also did not render ineffective assistance by failing to assert such a claim.

### (4)   Prosecutor's comments regarding Click's demeanor

The petitioner next asserts that his trial and appellate counsel were ineffective for failing to raise the claim that the prosecutor improperly commented on his Fifth Amendment right to remain silent.   (Petition at 112-13).   The Alabama Court of Criminal Appeals found that the petitioner's trial and appellate counsel were not ineffective for not objecting to the statement because it was a comment on the petitioner's demeanor, not on his failure to testify.   Specifically, the Court adopted the findings and conclusions of the Rule 32 court stating as follows:

> The prosecutor's statement did not even amount to an indirect reference to petitioner's failure to testify.   It was, rather, a direct comment [on] what the prosecutor believed to be the orchestrated posturing of the petitioner in order to create a particular impression in the mind of the jury.   Indeed, both Mark McDaniel and William Burgess testified that Click had been instructed to "look

27

down" and not to participate actively in his own defense.  This recommendation was part of the defense strategy to counter the state's assertion that Click was the "mastermind" of the murder plot.  In light of this acknowledgment by counsel, the prosecutor's remark was an accurate and highly perceptive comment on the petitioner's appearance and demeanor at counsel table.  It could not reasonably have been interpreted by the jury as any reference to his giving testimony or not in the case.

This Court notes that Judge Page, experienced with the responsibilities of trying a capital murder case, did not respond to the remark of the prosecutor.  Likewise, neither of Petitioner's counsel objected to the remark.  The failure to object should be weighed as part of our evaluation of the comments, because the failure to object may suggest that the defense did not consider the comments to be particularly harmful.

(Click Ex. L at 9-10, 15).

The comments made by the prosecutor did not relate to the petitioner's failure to testify but rather to his overall demeanor in the courtroom.  The Eleventh Circuit has held that a prosecutor's comments about a defendant's demeanor at counsel table during trial did not violate the defendant's Fifth Amendment right because the comments were not in reference to the defendant's failure to testify but rather to the conduct and the demeanor of the accused.  In *Hall v. Wainwright*, 733 F.2d 766, 773 (11th Cir. 1984), the court found that "[t]he prosecutor's comment on Hall's sleeping during the trial was not a comment on Hall's failure to testify.  It was not intended to be nor was it of such a character that a jury would naturally and necessarily take it to be.  The comment simply related to Hall's demeanor during the trial."  *See also Bishop v. Wainwright*, 511 F.2d 664, 668 (5th Cir. 1975) (stating that "the prosecutor's closing statements are understood, in this case, to be a comment upon Bishop's expressionless courtroom demeanor rather than upon his failure to take the stand and, thus, such comment raises no habeas corpus issue").  Under a *Strickland* analysis, the petitioner has failed to show either that his

28

counsels' conduct was deficient or that he was prejudiced by their failure to act.  As the Eleventh

Circuit has explicitly stated:

> The Supreme Court has mandated a highly deferential review of counsel's
> conduct, especially where strategy is involved.  (citation omitted).  Intensive
> scrutiny and second-guessing of attorney performance are not permitted.  Because
> it is a "wide range" of performance that is constitutionally acceptable, "the cases
> in which habeas petitioners can properly prevail on the ground of ineffective
> assistance of counsel are few and far between."  Cases in which deliberate
> strategic decisions have been found to constitute ineffective assistance are even
> fewer and further between.

*Spaziano*, 36 F.3d at 1039.  Both of the petitioner's trial counsel testified at the Rule 32 hearing

that they instructed Click to look down and not to actively participate in his defense as part of

their defense strategy.  (Click Ex. K at 6).  The Alabama Court of Criminal Appeals adopted the

Circuit Court's findings.  The petitioner has not presented anything in the instant petition that

establishes that the Court of Criminal Appeal's findings were contrary to clearly established

federal law as set out in *Strickland*.  Therefore, the petition is due to be denied on this claim.

**(5)    Failure to preserve for appellate review a claim
that trial court erred in allowing Preston to
testify regarding his opinion of Click's mental
state on the day of the murder**

The petitioner next asserts that his trial and appellate counsel were ineffective for failing

to preserve for appellate review a claim that the trial court erred in allowing Dr. Preston to testify

concerning his opinion of petitioner's mental state at the time he saw the petitioner on July 24,

1990.  (Petition at 114).  The Alabama Court of Criminal Appeals adopted the determination of

the Rule 32 court that the petitioner failed to meet his burden under *Strickland* regarding this

issue.  (Click Ex. L at 13, 15).  In support of this assertion, the petitioner cites *Ellis v. State*, 570

So. 2d 744, 753 (Ala. Crim. App. 1990):

> The jury may have an objective reason to disregard the expert's opinion if it concludes that the expert based his findings solely on the defendant's description of his own symptoms without verification by psychological testing and absent a past history of mental illness:
>
>> The adequacy of the factual basis of an expert's opinion also might be challenged if the expert relies only on the defendant's subjective description of his symptoms.  The clear danger is that the defendant has a strong interest in portraying his symptoms in a fashion that will support his claim of mental incompetency. . . .

(Petition at 114-15 (citing *Ellis* (internal citations omitted))).  The court is unclear, however, as to how *Ellis* applies to the instant petition.  In *Ellis*, the jury rejected the defendant's insanity defense even though the only expert testimony presented tended to show that she was insane at the time of the crime.  The defendant then argued that the jury verdict was "contrary to the weight of the evidence and was wrong and unjust."  *Ellis*, 570 So. 2d at 749.  Rejecting the defendant's argument, the court stated:

> We begin by stating the general rule in Alabama that, as persons on trial for commission of crimes are presumed sane, the defense of insanity is an affirmative defense which must be clearly proved to the jury's satisfaction and the burden of proof in this regard rests on the defendant.  Ala. Code, Title 15, § 422 (1958) . . . .
>
> In applying these propositions of statutory and case law, it has been stated that the question of insanity at the time of the commission of the crime is a matter to be determined by the jury from a consideration of all the evidence.  In making its determination, the jury may reject all expert testimony though it is without conflict . . .
>
>> . . . .
>
> Opinions of experts in the field of mental disorders as to an accused's sanity or insanity are of course admissible and certainly should be carefully considered by a jury.  Such opinion evidence is not , however, conclusive on the

> jury.  The responsibility is upon the jury to weigh all the evidence, expert and lay,
> pertaining to the issue of the accused's mental competency . . . .

*Ellis*, at 750-52.  The passage set forth by the petitioner has no relevance to his petition.

Although it is unclear, the petitioner seems to be arguing that Preston's opinion of his mental

state should not have been struck because he based his opinion on the meeting he had with the

petitioner on the day of the murder.  (Petition at 114-15).

In addressing this issue, adopting the Rule 32 court's findings and conclusions, the

Alabama Court of Criminal Appeals held:

> Petitioner has several allegations that he was denied effective assistance of
> counsel at trial relating to issues not properly preserved for appellate review.[14]
> The linchpin in his argument for each of these is that they "would have been
> addressed favorably on appeal."  Indeed, he cannot demonstrate the prejudice
> required under *Strickland* unless such is true.

> Prior to addressing that issue, the Court must determine whether the first
> prong was met.  No evidence was presented that counsel's performance "fell
> outside the wide range of professionally competent assistance."  466 U.S., at 690.
> The only attorneys who testified were petitioner's trial counsel.  They received a
> few questions regarding their supposed failures on these issues.  For those issues
> raised with trial counsel, the Court finds their justifications appropriate trial
> strategy.

> The Court notes that, particularly in matters before a jury, counsel should
> be given latitude to determine which objections to initiate or pursue further.  Due
> to their familiarity with all the facts of the case, their trial strategy, and the
> appropriate law, they are uniquely positioned to make such determinations.  For
> example, continuing an objection over the particular wording of a question may
> only serve to have the information come before the jury through a more
> appropriately worded question.  Not only is the critical information still received,
> the jury's interest is piqued and they will remember it.

---

[14]This claim, that counsel failed to properly preserve the argument precluding Preston from testifying regarding the mental condition of the petitioner on the day of the murder, was one of the claims that the Court of Criminal Appeals was addressing in this section of its opinion.

Even assuming, *arguendo*, that trial counsel was shown to be deficient in any of these matters, for petitioner to establish ineffective assistance of counsel he must demonstrate that he was prejudiced by such failure. There is no evidence any of these items rise above the bar of harmless error they must meet for appellate review.

Considering these allegations and the testimony adduced at the evidentiary hearing ordered by this Court, Petitioner has failed to demonstrate that his counsel's conduct was deficient. Even if Petitioner has satisfied that first hurdle, he has not shown how he was prejudiced by that conduct. Petitioner has the burden of pleading and proving by a preponderance of the evidence that trial counsel's alleged deficient conduct had an effect on the conviction, sentence, or appeal. *See Wright v. State*, 593 So. 2d 111 (Ala. Cr. App. 1991). Petitioner has failed to meet his burden.

The Court finds upon the evidence presented that, judged under prevailing professional norms, the performance of trial counsel as to these issues during trial was reasonable, considering all the circumstances.

(Click Ex. L at 13-15).

Further, Dr. Preston stated in his trial testimony that his opinion concerning any mental illness the petitioner had that would affect his appreciation of the nature, quality, or wrongfulness of the action committed was based on the petitioner's history, long-term mental status, results of psychological tests, and the petitioner's response to medications he had been prescribed. (Click Ex. P at 1123-26). There is nothing to suggest that Preston's opinion of the petitioner's mental status was based solely on the meeting of July 24, 1990. Therefore, there is no reason that trial or appellate counsel should have argued otherwise. The petitioner's trial counsel attempted to discredit Preston's testimony and opinions by pointing out to the jury that Preston was not a "Psych-D" at the time of the trial, much less at the time he was treating the petitioner (*id*. at 1131); by pointing out that out of all the psychologists and psychiatrists that had treated the petitioner, his opinion was "unique in a significant history of evaluations" (*id*. at 1132); by

pointing out that the only time period between April 1989 and trial that the petitioner wasn't medicated with major psychotropic medications was during the time he was being treated by Preston and Dr. Traynor (*id*. at 1133); and by pointing out a plethora of things Preston overlooked in his diagnosis and treatment of the petitioner and in his reporting to Traynor, including, but not limited to dissociations and suicidal and homicidal ideations (*id*. at 1134-36). Even if Preston based his opinion on the July 24, 1990 meeting alone, nothing in *Ellis* would preclude Preston from being able to testify as such and nothing in *Ellis* would require the petitioner's trial attorneys to act any differently than they did. Therefore, the petitioner's assertion that his trial attorneys were ineffective is without merit.

> **(6)    Failure to argue that Preston was not a medical expert who Maier could rely upon in formulating his opinion regarding Click and failure to argue and preserve the issue that Maier improperly relied on police reports and on co-defendant statements in arriving at his opinion**

This claim encompasses two issues so the court will address them separately. The first part of Click's claim is that the petitioner's trial counsel failed to argue that Maier improperly relied upon conversations with Preston when formulating his opinions because Preston was not a medical expert. (Petition at 116-17). The Alabama Court of Criminal Appeals held the following in relation to this issue:

> In light of the burden of proof placed upon Petitioner . . . and the reasoning set forth under allegation 9(e), this allegation is likewise found to be without merit. Dr. Maier may consider information from many sources in making his forensic assessment of Petitioner's competency at the time of the offense. Further, there was no testimony that Dr. Preston's licensure, or lack thereof, would affect how Dr. Maier considered any information he received from Dr. Preston.

(Click Ex. L at 12).

The petitioner has not set forth any evidence that would show that the Alabama Court of Criminal Appeals' decision was contrary to or an unreasonable application of any established federal law.  Even if he had, he cannot show that he was subjected to any prejudice resulting therefrom in light of Maier's testimony that he did not rely solely on conversations with Preston and the lack of evidence regarding the effect of Preston's licensure on Maier's opinion. Therefore, his counsel could not have been ineffective for failing to argue such.

The second issue in this claim is whether trial counsel should have argued that Maier improperly relied on police reports and co-defendant statements in formulating his opinion. (Petition at 117).  The Alabama Court of Criminal Appeals did not write to this issue in their opinion.  Therefore, this court cannot state whether the Court of Appeals' decision was based on an unreasonable application of clearly established federal law.  The petitioner's sole basis for why Maier's reliance on the police report and co-defendant statements was improper is that "the Court of Criminal Appeals held that the admission of expert witness testimony giving the expert's opinion of medical condition of the defendant based substantially on facts not in evidence was plain error in a capital murder case because the jury cannot assess the weight to be given to the expert's opinion."  (Petition at 117 (citing *Madison v. State*, 620 So. 2d 62 (Ala. Crim. App. 1992))).

However, even if the court were to assume that the petitioner's counsel was ineffective for failing to present this issue on appeal, the petitioner has still failed to show any prejudice resulting from such ineffective assistance.  Dr. Maier testified that he looked at Bottorff and

34

Sato's statements as well as the police reports.  The substance of all of those documents was admitted into evidence during the trial through the co-defendants' testimony and the testimony of investigators who took the petitioner's statement in the police report.  Therefore, the petitioner has failed to meet his burden under *Strickland* and is not entitled to any habeas relief on this claim.

> **(7)    Failure to preserve the issue of the trial court's wrongful exclusion of Cathy Lambert's testimony regarding the petitioner's mental illness for appeal**

The petitioner next claims that his trial and appellate counsel were ineffective for failing to preserve the issue that the trial court erred in excluding the testimony of his mother, Cathy Lambert, concerning his diagnosis of suffering from mental illness on the basis that it was hearsay.  (Petition at 117-18).  In regard to this issue, the Alabama Court of Criminal Appeals concluded, premised on the findings and holding of the Rule 32 court, that the petitioner failed to meet his burden of proof with respect to the issue and failed to show how the alleged deficient conduct had an effect on his conviction, sentence, or appeal, or that the alleged error rose above the bar of harmless error he had to show for appellate review.  (Click Ex. L at 13, 15).

The petitioner asserts that this testimony was crucial to prove that petitioner was mentally deranged and that such testimony would not be violative of the hearsay rule.  However, Ms. Lambert did testify at trial that her son was mentally ill.  She was not allowed to testify as to what various doctors told her regarding her son.  (Click Ex. P at 813-64).  Other evidence was shown at trial to substantiate that the petitioner had mental health issues, including testimony from the same doctors and professionals whose opinions the defense complains Ms. Lambert was unable

to repeat.  Specifically, the petitioner offered the testimony of Dr. James Merikangas, Dr. Sheila

Clark, Dr. James T. Pierce, and Dr. David Rush, all of whom testified to the petitioner's mental

instabilities and their opinions and diagnoses of the petitioner.  Therefore, the petitioner was not

prejudiced by the trial court's refusal to allow his mother to repeat these doctor's diagnoses of

her son on the witness stand.  Accordingly, the petitioner can not show that his counsel was

ineffective for failing to preserve this issue for appeal and he is not entitled to any habeas relief

on this claim.

>    **(8)    Failure to preserve for appeal the issue of the
>            trial court's error in allowing the prosecutor's
>            statement regarding a co-defendant's trial**

The petitioner's next claim is that his trial and appellate counsel were ineffective for

failing to preserve the issue that the trial court erred in allowing the prosecutor to tell the jury to

write her boss if they did not like the way the co-defendant's case was handled.  (Petition at 118).

Regarding this issue, the Alabama Court of Criminal Appeals concluded that the petitioner failed

to meet his burden of proof and failed to show that the alleged deficient conduct had an effect on

his conviction, sentence, or appeal.  (Click Ex. L at 13).  The petitioner asserts that the

prosecutor, through her statement, "was able to maintain her credibility" and play "Mutt and

Jeff" with the jury by distancing herself from the deal and by asking the jury to be critical of her

boss instead of her.  (Petition at 119).  The petitioner's attorneys did not object to her statements,

and petitioner argues that a proper objection would have allowed the matter to be addressed

favorably on appeal.  (*Id*.).

The jury was given instructions that they are the sole triers of fact and that nothing the

lawyers say should be considered as evidence.  (Click Ex. P at 187, 1223).  The Alabama Court of Criminal Appeals found that the comment did not rise above the bar of harmless error when viewed in conjunction with the jury instructions.  The petitioner has not offered any evidence tending to establish that his counsel was ineffective for failing to object and preserve for appeal the prosecutor's statement and any basis they would have had for doing so.  This claim is without merit and the petitioner is not entitled to any habeas relief on it.

### (9)   Failure to preserve the issue of the prosecutor's inappropriate opinion testimony for appeal

The petitioner next claims that his trial and appellate counsel were ineffective for failing to preserve the issue that the prosecutor's statement that in her personal opinion that petitioner had been doing "street drugs" long before he knew the victim was inappropriate opinion testimony.  (Petition at 119).  The petitioner argues that it is improper for an attorney to argue facts not in evidence, to misstate the facts, or to express a personal opinion.  In support thereof, he cites *Donnelly v. DeChristoforo*, 416 U.S. 637, 94 S. Ct. 1868, 40 L. Ed. 2d 431 (1974); *United States v. Warren*, 550 F.2d 219 (5th Cir. 1977), *Arthur v. State*, 575 So. 2d 1165 (Ala. Crim. App. 1990).  The Alabama Court of Criminal Appeals on direct appeal held that  "[h]ad the argument been properly preserved, the instructions to the jury from the trial court would have cured any error caused by this remark.'"  *Click*, 695 So. 2d at 231.

This court agrees that the petitioner cannot show any prejudice resulting from counsel's failure to preserve this issue for appeal.  As stated previously, the trial judge properly instructed the jury that they were the sole triers of fact and that nothing the lawyers said should be considered as evidence.  Given this instruction, the petitioner could not and has not shown that

he was prejudiced by his counsel's failure to preserve this issue for appeal.  The petitioner is not

entitled to any habeas relief on this claim.

> **(10)   Failing to properly address the issue that the
> trial court erred in denying petitioner's motion
> to suppress his statement to the police**
>
> **(11)   Failing to present all facts and case law
> concerning the argument that the trial court
> erred in denying his motion for a judgment of
> acquittal because the great weight of the
> evidence proved that he was insane at the time of
> the offense**

The petitioner argues that counsel failed to properly address the suppression issue and

failed to present all the relevant facts and law concerning the petitioner's mental condition for

purposes of the motion for judgment of acquittal at trial and on appeal.  (Petition at 119-24).  On

these issues, the Alabama Court of Criminal Appeals again adopted the findings and conclusions

of the Rule 32 court, holding that:

> Through these allegations, petitioner raises the issue of his motion to
> suppress statements and motion for judgement of acquittal.  Both were denied at
> the trial court level and this denial was upheld on appeal.  Within his petition,
> petitioner alleges that counsel failed to argue all the facts or law on appeal and
> was deficient in doing so.
>
> The Court notes that, within the petition, Petitioner expends several pages
> stating why the decisions of the trial court and the Court of Criminal Appeals
> were erroneous.  However, he fails to delineate what omission of fact or law by
> counsel was made and how that omission would affect the resolution of those
> issues by the appellate court.  That these issues were not addressed with appellate
> counsel in the evidentiary hearing reiterates the Court's point; that these
> allegations merely seek to relitigate issues already adjudicated.
>
> In light of the forgoing, these issues are precluded by Rule 32.2(a)(2) and
> (a)(5) because they were raised and addressed at trial or on appeal.  Further, as to
> their merits, Petitioner bears the burden of pleading and proving that counsel's

conduct had an effect on the appeal . . . .  Petitioner has failed to meet this burden.

Assuming that these issues are not precluded under Rule 32.2(a)(2) and (a)(5), the Court finds upon the evidence presented that, judged under prevailing professional norms, the performance of trial and appellate counsel in pursuing petitioner's motion to suppress statements and petitioner's motion for judgment of acquittal was reasonable, considering all the circumstances.

(Click Ex. L at 14, 15).

The petitioner has failed to produce any additional evidence to this court that would allow it to find the determination made by the Alabama Court of Criminal Appeals is contrary to or an unreasonable application of clearly established federal law.  As such, the petitioner is not entitled to any relief on these claims.

### CLAIM IV:  ALABAMA APPELLATE COURTS ERRED IN HOLDING THAT THE FIFTH AMENDMENT PRIVILEGE AGAINST SELF-INCRIMINATION ENDS AFTER A PERSON HAS HAD A TRIAL AND EXHAUSTED DIRECT APPEALS

The petitioner asserts that the appellate courts erred in holding that the Fifth Amendment privilege against self-incrimination ends after a person has had a trial and exhausted his direct appeals.  (Petition at 125-41).  The respondents retort that this claim is moot because it concerns the petitioner's alleged right not to testify at a Rule 32 hearing.  (Answer at 31).  The petitioner acknowledges that he never took the stand or testified at the Rule 32 hearing.

By asserting this claim in the instant petition, the petitioner is effectively asking this court to issue an advisory opinion on this issue.  This the court cannot do.  Because the petitioner did not testify at the Rule 32 hearing, he has no basis on which to complain about the state court's actions.  Because this issue is not properly before this court, it is due to be dismissed.  Additionally, it is not a ground for federal habeas corpus relief.  *See* 28 U.S.C. § 2254(a).

39

**CLAIM V:  PETITIONER'S FIRST, FOURTH, FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENT CLAIMS**

Under this last claim, the petitioner adopts various "sub-issues" that were raised on his direct appeal.  (Petition at 141).  The three issues concern the denial of his motion to suppress his statement to the police, his *Batson* challenges, and the trial court's denial of his motion for judgment of acquittal.  (*Id*. at 141-45).  The respondents assert that he is entitled to no relief on these substantive issues.  (Answer at 64-70).

### A.  The motion to suppress his statement to the police

The petitioner asserts that the trial court erred in its decision to suppress his statement to the police.  (Petition at 142).  The respondents retort that this claim was adjudicated on the merits by the state courts and, therefore, pursuant to 28 U.S.C. § 2254(d), the petitioner is not entitled to relief.  (Answer at 64-68).

The Alabama Court of Criminal Appeals on direct appeal stated that the petitioner was read his *Miranda* rights at an appropriate time and he voluntarily waived those rights.  *Click*, 695 So. 2d at 217-18.  Specifically, the Court stated:

> . . . . [T]he appellant was advised of his *Miranda* rights at the proper time and in the proper manner by the investigators involved in the case.  The appellant's interrogation did not become custodial in nature until just before he was advised of his rights.  The appellant's initial statement to the police was made at the police station and before he was the focus of the investigation.
>
> It is inevitable that the appellant would have been questioned by the police because they had information that he was one of the last persons to see the victim alive.  Nothing in the record suggests that the appellant was not free to leave the police station or that he was in custody until the point at which he became a suspect and was advised of his rights.  The record indicates that his stepfather arrived with the appellant and had been waiting outside the interview room to take him home.  Also, the fact that the questioning occurred at the police station does

40

not necessarily lead to a conclusion that appellant was in custody for *Miranda* purposes.

> '[P]olice officers are not required to administer *Miranda* warnings to everyone they question. Nor is the requirement of warnings to be imposed simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect." . . .

The appellant's contentions that his incriminating statement was made under duress because his stepfather was not allowed to be present in the interview room and because he was tired when he made the statement are also without merit. The trial record gives no indication that the appellant asked for his stepfather to be present during the interview. To the contrary, the record reflects that the appellant asked investigators to make his stepfather leave the building after he had been read his rights. (R. 675.)

Also missing from the record is any indication that the appellant requested that the investigators stop their questioning because he was tired. The appellant had been advised of his rights and had consented to further questioning; therefore, the statements he subsequently made were properly admitted.

Additionally, the appellant's claim that Investigator Sharp gave him legal advice is without merit. This allegation is addressed in the following testimony from Investigator Sharp during the State's direct examination:

> "[The appellant] asked me, if someone is present when someone gets killed, but not involved, would he be arrested? I told him it was according to the circumstances. If he had any involvement in it, or, you know, just according to the circumstances as to whether the person would be arrested or not. And then it was around 1:30 he told me he was going to tell me the truth."

(R. 448.) The investigator's comment was in response to a direct question by the appellant and suggested no particular course of action for appellant to take at that point. It was not legal advice.

The trial court did not err in admitting the appellant's statements into evidence.

The appellant's second argument with regard to the Miranda issue is that

he suffered from a mental illness that prevented him from voluntarily waiving his rights because, he says, he could not understand and comprehend the significance of those rights.  The appellant cites that he was diagnosed with a mental disorder at the age of eight years old, that he had twice undergone inpatient treatment at the psychiatric unit at Mountain View Baptist Hospital in 1989, and that he was being treated with psychotropic and antidepressant drugs at the time of his arrest.  (R. 597-607.)  Additionally, Dr. James Merikangas, appellant's expert witness, testified at the suppression hearing that, in his opinion, the appellant could not have knowingly and intelligently waived his Miranda warnings because he suffered from a mental illness.  (R. 615-17.)  Both Dr. Merikangas, who evaluated the appellant in 1993, and Dr. Sheila Clark, who was the psychiatrist at Mountain View Baptist Hospital who was treating the appellant before his arrest, had diagnosed the appellant with "schizo-affective" disorder.

The State argues that although the appellant suffered from a mental disease or defect, he was competent to waive his Miranda rights.  As grounds for its argument, the State cites the trial testimony of Dr. Frank Preston; a psychologist who was treating the appellant prior to his arrest and who had last seen the appellant on the evening before Ms. McClure was killed.  Dr. Preston testified that the appellant was acting normally and that he appeared to be lucid at that time. (R. 632.)

Whether a waiver is voluntary, knowing, and intelligent depends on the particular facts and underlying circumstances of each case, including the background, experience, and conduct of the accused - - i.e., the totality of the circumstances. . . .  The trial court need only be convinced from a preponderance of the evidence that a confession or inculpatory statement was voluntarily made. The finding of the trial court as to voluntariness will not be disturbed unless it appears contrary to the great weight of the evidence.

In the instant case the trial judge had ample evidence from which to conclude that the appellant voluntarily and knowingly waived his *Miranda* rights. Doctor Merikangas testified that his opinion was based on an examination that took place approximately two and one-half years after the appellant was arrested. (R. 620.)  Dr. Preston's testimony that the appellant appeared to be lucid on the day before he was arrested was based on personal observation.  Additionally, the investigators who took the appellant's statements testified that there was nothing about his appearance or demeanor to suggest that he was suffering from a mental illness at the time he waived his rights or that he did not understand his rights when he waived them.  (R. 485-92.)  There was evidence that despite his mental condition, the appellant had performed in the superior range (130 to 149) of an

42

I.Q. test.  (R. 594, 601.)  This information, when combined with other factors such
as the appellants' planning of Ms. McClure's death and his subsequent efforts to
conceal his involvement in her death from the investigators, leads us to conclude
that the trial court was correct in determining that the appellant was capable of
understanding his rights when he waived them.  The trial court did not err in
allowing the appellant's statements to be admitted.

      The appellant argues that the trial court erred in not granting his motion to
suppress evidence gathered pursuant to a search conducted after his questioning
by the police because, he says, his confession was illegally obtained.  Because we
have already held that the appellant was properly informed of his rights before the
incriminating statements that led to the discovery of the evidence were made, we
also conclude that the evidence gathered by the police as a result of the statements
was properly admitted by the trial court.  The appellant's argument with regard to
this issue is without merit.

*Click*, 695 So. 2d at 217-18.

The appellate court's conclusion was based on a reasonable determination of the facts

surrounding the petitioner's questioning by the police.  The petitioner has not established that the

Court of Criminal Appeals's determination was contrary to or an unreasonable application of

*Miranda* or in violation of the Fourth Amendment.  The petitioner is not entitled to any relief on

this claim as there is no basis for determining that there was a mistake in not suppressing the

petitioner's statement.

### B.  The petitioner's *Batson* motion

The petitioner next alleges that the trial court erred in denying his *Batson v. Kentucky*,

476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986) motion, which alleged that the state used its

peremptory strikes in a racially discriminatory manner with regard to four of its strikes.  (Petition

at 142-44).  In response, the state retorts that the Alabama Court of Criminal Appeals already

squarely addressed this issue on the merits and found that the state did not violate *Batson* in its

use of peremptory strikes.  (Answer at 68-70).  Specifically, the court found that:

> . . . . [Click's] *Batson* challenge is based on four strikes by the State of black venire members.  After the appellant made his *Batson* motion, the court ruled that a prima facie case had been made.  After explanation for the challenged strikes were given by the State, the court ruled that the State's reasons for those strikes were race-neutral and denied the motion.

> Once it has been determined that a prima facie case of discrimination has been established, the burden falls upon the proponent of the challenged strike to "articulat[e] a clear, specific, and legitimate reason for the challenge which relates to the particular case to be tried and which is nondiscriminatory." . . .

> . . .

> The record reflects that the State struck juror number 55 because he had expressed reservations concerning the death penalty.  "'That a venire-member has reservations concerning the death penalty, though not sufficient for a challenge for cause, may constitute a race-neutral and reasonable explanation for the exercise of a peremptory strike.'"  The court did not err in allowing this strike.

> The State's reasons for striking juror number 68 were that he had a past assault conviction and that he had studied for the ministry.  "We have repeatedly held that a veniremember's connection with or involvement in criminal activity may serve as a race-neutral reason for striking that veniremember."  In addition, the fact that number 68 had studied for the ministry concerned the State with regard to his views on the death penalty.  The fact that a veniremember is a preacher, pastor, or minister may constitute a sufficient reason for a peremptory strike.  Although the veniremember's prior assault conviction is a much more legitimate reason for striking him than the other, both reasons given by the State are sufficiently clear, specific, and race-neutral to support our affirmance of the trial court's decision with regard to juror number 68.

> The State's reasons for striking veniremember number 64 were that he had been convicted for some type of obscene conduct in the past and that he was uncertain of his feelings with regard to the death penalty.  As already noted, both reasons are sufficient support for the trial court's decision with regard to this juror.  Additionally, his lack of candor in answering the jury questionnaire is a sufficiently race-neutral reason for the State's strike.

> Veniremember number 93 expressed doubts about the death penalty and

44

had a prior conviction for driving under the influence.  Additionally, he had
consulted defense counsel with regard to a legal issue in the past and had also
served on a prior jury that had returned a verdict of not guilty.  Again, the State's
reason for striking the juror are clear, specific, and race-neutral.

*Click*, 695 So. 2d at 219-20.

Click has not presented any authority showing that the Alabama Court of Criminal

Appeals's decision is contrary to or an unreasonable application of *Batson*.  To the contrary, the

court set out why the state's strikes were proper in light of *Batson*.  This court agrees.  Therefore,

the petitioner is not entitled to any habeas relief on this claim.

### C.  Denial of the motion for a judgment of acquittal

The petitioner asserts that the trial court erred in denying his motion for judgment of

acquittal because the great weight of the evidence proved that he was insane at the time of the

offense.  (Petition at 144-45).  The respondents retort that the claim is not cognizable in a federal

habeas corpus proceeding because it does not concern the constitutionality of his detention.

(Answer at 28).  Therefore, the state argues that this court does not have subject matter

jurisdiction to entertain it under 28 U.S.C. § 2254.  (*Id.*).

The petitioner alleges that the great weight of the evidence proved that he was insane at

the time of the offense, and therefore he should have been acquitted on the basis of his insanity

defense.  However, a "petitioner's mental capacity to commit the crime of which he was

convicted, relating as it does to his guilt or innocence . . .", and not to the constitutionality of his

detention, is not a ground for relief on federal habeas corpus."  *Jones v. State of Montana*, 231 F.

Supp. 531, 533 (D. Mont. 1964).  *See also United States ex rel Cataliotti v. Mancusi*, 309 F.

Supp. 1182, 1183 (D.N.Y. 1970) ("this defense of insanity would go only to the issue of guilt or

innocence and not to the constitutional validity of his conviction"). An affirmative defense such as this is not properly brought forward under a federal habeas review. Therefore, the petitioner is not entitled to any relief on this claim.

To the extent the issue can be interpreted as a challenge to the sufficiency of the evidence, it is without merit. The applicable standard in a sufficiency of the evidence claim such as the present one was set forth in *Jackson v. Virginia*, 443 U.S. 307, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979). In *Jackson*, the Supreme Court held that when the sufficiency of the evidence is challenged, the issue is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson,* 443 U.S. at 319. The petitioner is entitled to relief only if it is shown that "no rational trier of fact could have found proof of guilt beyond a reasonable doubt." *Id*. at 324.

The evidence adduced at trial, as outlined by the Alabama Court of Criminal Appeals, was sufficient to establish the petitioner's guilt. The petitioner in no way approaches the *Jackson* standard for relief. This is especially true as the evidence must be construed in a light most favorable to the prosecution. There is no way for this court to conclude that "no trier of fact could have found proof of guilt beyond a reasonable doubt." *Jackson*, 443 U.S. at 324.

**CONCLUSION**

Upon full consideration of the petitioner's arguments, the court finds that the petition for a writ of habeas corpus is due to be denied and dismissed with prejudice. An appropriate order will be entered.

46

The Clerk is **DIRECTED** to serve a copy of this Memorandum Opinion upon counsel for the petitioner and counsel for the respondents.

**DONE and ORDERED 25 July 2006.**

**UNITED STATES DISTRICT JUDGE**
**J. FOY GUIN, JR.**